## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MASONICARE CORPORATION, | : | Civil Action No. |
| | : | _____ |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| CERNER COPRORATION, | : | |
| | : | June 17, 2021 |
| Defendant. | : | |

## COMPLAINT

Plaintiff Masonicare Corporation ("Masonicare") by and through its attorneys, hereby files this Complaint against defendant, Cerner Corporation ("Cerner"), and states as follows:

## THE PARTIES

1.      Plaintiff Masonicare Corporation is a Connecticut corporation with its principal place of business at 22 Masonic Avenue, Wallingford, CT 06492.  Masonicare is a not-for-profit organization that provides services throughout the State of Connecticut including Residential Living Services, Skilled Nursing, Long Term Care, Acute Care, Home Health, Hospice and Palliative Care.

2.      Defendant Cerner Corporation is a Delaware corporation with its principal place of business located at 2800 Rockcreek Parkway, Kansas City, MO 64118.  Cerner licenses and sells healthcare information software systems and related hardware to healthcare entities.

1

## JURISDICTION AND VENUE

3.      This Court has federal diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because the action involves a dispute between citizens of different states and the amount in controversy exceeds $75,000.

4.      This Court has personal jurisdiction over the parties and venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

**A.      CERNER'S MARKETING AND SALE OF COMMUNITYWORKS**

5.      In 2014, Masonicare issued a Request for Proposal ("RFP") seeking proposals for an integrated healthcare information system ("HCIS") that would offer integrated electronic health record system ("EHR") across Masonicare's continuum of care, which included:

- Acute care facilities

- Skilled nursing and rehabilitation facilities

- Residential living communities

- Home health and hospice care services

- Outpatient specialty clinics and rehabilitation services

- Behavioral health services

- Physician practices

6.      On March 30, 2014, Cerner submitted an RFP Response presenting what it represented as a comprehensive solution to Masonicare's electronic health record requirements.

7.      Cerner stated: "Cerner has a unique and affordable solution for Community and specialty Hospitals like Masonicare called Cerner CommunityWorks.

CommunityWorks is Software as a Service (SaaS) delivery model which utilizes the same Cerner Millennium platform as our traditional clients only delivered in a manner which aligns with specialty organizations that have limited IT staff and infrastructure."  (Emphasis added.)

       8.    Cerner stated that CommunityWorks was a turn-key solution that "will meet Masonicare's needs now in the present and provide a platform for the future."

       9.    Cerner stated that CommunityWorks was ranked 2013 "Best in KLAS" Community Health Information System and was:

*Person-centric* - Cerner Millennium is built on a person-centric single database, which ensures a "single source of truth" for integrated clinical and financial patient information. This gives all clinicians at Masonicare electronic access to the right information at the right time and place to achieve optimal health outcomes.

*Proven* - Cerner is a proven, world-class provider that has been transforming healthcare for over 34 years. We have achieved a record of success partnering with clients to achieve their vision.  Further, Cerner has proven we can deliver all implementations in a short period of time and remain competitive with the total investment. Masonicare can be certain that the system will allow you to do what you do best, provide person-centric care.

*Complete* – With over 65 solutions, Cerner provides a complete suite of integrated solutions for every major department and specialty within Masonicare's health system. Among others, our proven solutions include content centered around nursing, physician, outpatient, long-term-care, home health, revenue cycle, and all clinical departments. You can be assured from Acute Care to Therapies; Cerner will be your one stop system.

*Unified* - Our truly integrated offering creates a seamless patient record across care delivery venues, eliminating dual documentation and ultimately increasing patient safety.  Masonicare will not have to worry about managing interfaces between different departments as they are built together on a single database architecture built from the ground up.

      10.    Cerner included the following diagram purporting to show the capability of the CommunityWorks solution to integrate information across Masonicare's continuum of care:



11.    Cerner completed the RFP's 113-page template, which asked detailed questions for each of the following 15 functional areas, including 52 sub-functions:

- Enterprise Master Patient Index

- Referrals and Authorizations

- Insurance Eligibility Checking

- Admissions

- Scheduling

- Revenue Cycle Management

4

- Enterprise Document Management

- Health Information Management

- Portal Requirements

- Pharmacy

- Ambulatory EMR

- Clinicals

- Acute Care

- Wound Care Management

- Financial

12.     In the Cerner RFP Response, Cerner falsely and deceptively stated that CommunityWorks would address the functionality Masonicare required for every functional area and sub-function except Financial.

13.     Cerner's representations about stability, performance characteristics and operational efficiency and integration were based on Cerner Millennium, not the CommunityWorks product that Cerner was proposing to sell to Masonicare.

14.     Cerner falsely represented that CommunityWorks would be Masonicare's "one stop system for integrated clinical and financial patient information."   In fact, the CommunityWorks system was not integrated and could not be integrated with the systems used for medical billing and financial patient information.   In fact, the lack of integration was so severe that, after the Cerner system went live, Masonicare had to perform processes manually on paper.

15.     Cerner falsely represented that in CommunityWorks, "interfaces between different departments . . . are built together on a single database architecture built from the ground up."

16.     In fact, CommunityWorks does not facilitate "interfaces between different departments" without extensive modifications necessary to address Masonicare's specific requirements, modifications Cerner knew could not be made if the system was hosted on a shared domain.

17.     Cerner knew that its representations regarding performance capabilities and track-record were derived from the use of the Millennium product in acute care settings, and did not accurately apply to long term care and the other parts of the continuum of care for which Masonicare was explicitly seeking a solution in the RFP.

18.     Cerner knew that its representations were inaccurate and deceptive because CommunityWorks – the SaaS offering Cerner proposed to Masonicare – is a different product from Millennium, and Millennium was not the solution it was proposing to Masonicare.

19.     Cerner intended that Masonicare would understand from Cerner's representations that the solution Cerner was proposing for Masonicare would have the stability, performance characteristics and operational efficiency and integration that characterized the experience of Cerner's Millennium customers.

20.     Cerner represented that "all system upgrades for purchased solutions are built in the total cost."

21.     What Cerner did not tell Masonicare was that it would implement "system upgrades" to the CommunityWorks domain even where these changes disrupted or interfered with the functionality promised to Masonicare.

22.     Cerner's false and deceptive statements were made to induce Masonicare

to purchase the CommunityWorks product.

23.     Cerner quoted a price of $4,748,195 for year one, and a monthly charge of $107,541 for 72 months, for a total cost of almost $12.5 million.

**B.     MASONICARE CONTRACTS WITH CERNER**

24.     In reliance on Cerner's RFP Response, Masonicare agreed to contract with Cerner.

25.     Effective March 31, 2016, the parties executed an agreement titled Cerner Business Agreement and Cerner System Schedule 1 (collectively, the "Cerner Contract").[1] (*See* Exhibit 1 hereto.)

26.     The Cerner Contract sets forth Cerner's promise to deliver the functionality described by Cerner in its RFP Response.

27.     Schedule 1 of the Cerner Contract includes 99 pages of detail setting forth the CommunityWorks modules Cerner was offering to meet Masonicare's requirements.

28.     Schedule 1, Exhibit B, sets forth Cerner's detailed answers, initially provided as part of its RFP Response, stating how Cerner would meet Masonicare's functional requirements.  For every area, Cerner stated that the requirements would be met by Cerner's CommunityWorks system.

29.     The answers in Exhibit B are grouped in three categories: Long Term Care, Home Health and Hospice, and Psych-Behavioral. Masonicare's functional requirements, and Cerner's responses, are sorted by master numbers for each system requirement, a description of the requirement, Cerner's representation of the extent to which its proposed solution meets the requirement (expressed in percentage terms), and Cerner's description of how its proposed

---

[1] The parties later executed Amendment 1 (September 16, 2016), Amendment 2 (June 15, 2017), Additional Sales Order (June 20, 2017), Additional Sales Order (July 24, 2017), Schedule 2 (September 1, 2017), and Amendment 3 (October 16, 2017).

solution meets the requirement.

30.    Cerner    advised    Masonicare    that    for    certain    functionality, CommunityWorks would be integrated with third-party systems: NTT Data/Cantata for medical billing and reimbursement, and Tribridge/Great Plains for Masonicare's financial management functions.

31.    The    Cerner    Contract    represented    that    Cerner    would    integrate CommunityWorks with the NTT Data/Cantata and Tribridge/Great Plains systems to achieve the functionality Masonicare required.

32.    Masonicare entered separate contracts with NTT Data/Cantata and Tribridge/Great Plains based on Cerner's specification and endorsement of these systems as Cerner's "preferred provider."

## C.    THE CERNER SYSTEM GOES LIVE BUT LACKS THE REQUIRED FUNCTIONALITY AND INTEGRATION

33.    In August 2016, Cerner began working with Masonicare on the implementation of Cerner CommunityWorks.

34.    In December 2017, Masonicare went live with Cerner's CommunityWorks system.

35.    When Cerner's CommunityWorks system went live, it lacked the necessary functionality for the Long Term Care portions of Masonicare's operations.

36.    CommunityWorks also was not adequately integrated with NTT/Cantata's medical billing system that Cerner had directed Masonicare to purchase specifically for integration with CommunityWorks.

37.    In February 2018, Masonicare expressed detailed concerns to Cerner's Client Results Executive about the stability and functionality of the Cerner system.

38.    In March, April, May, and July 2018, Masonicare had numerous calls with Cerner and provided detailed lists of the functionality shortfalls in the CommunityWorks system and the integration problems between the Cerner and NTT Data/Cantata systems.

39.    During those telephone conversations, Cerner repeatedly assured Masonicare that the CommunityWorks system's functionality and integration shortcomings would be resolved.

40.    Cerner's persistent failure to resolve these shortcomings caused Masonicare to retain an independent technology consultant, LeaderStat, to evaluate the functionality of the CommunityWorks system.  Masonicare insisted that Cerner pay for this report, and Cerner agreed.

41.    LeaderStat prepared a report reviewing the CommunityWorks system and its functionality and integration shortcomings.  LeaderStat's conclusions regarding these shortcomings were consistent with what Masonicare had consistently communicated to Cerner.

42.    By August 2018, Cerner's failure to resolve the CommunityWorks system's functionality and integration shortcomings forced Masonicare to turn to paper recordkeeping for several critical functions.

43.    In September 2018, Surveyors from the Connecticut Department of Public Health ("DPH") conducted an on-site visit to Masonicare.  Due to the deficiencies in the Cerner system, DPH could not access all information needed for its review.

44.    DPH notified Masonicare that the shortcomings in the Cerner system must be resolved before the upcoming annual DPH survey, or Masonicare would be penalized.

45.    Masonicare demanded that Cerner solve the Cerner system's serious lack of integration and Long Term Care functionality.

9

46.     Cerner assured Masonicare that the problems would be resolved and that the Cerner system would meet Masonicare's operational requirements – the functionality that Cerner had promised during the RFP process, in the Cerner Contract, and repeatedly since the Cerner system had gone live.

**D.     MASONICARE DEMANDS THAT CERNER CURE THE SYSTEM DEFICIENCIES AND INTEGRATION PROBLEMS**

47.     Despite Cerner's assurances, the Cerner system continued to exhibit the same functional and integration shortcomings that had plagued the system since going live.

48.     On November 30, 2018, Masonicare notified Cerner in writing of the specific failures of the Cerner system that needed to be resolved. Masonicare demanded an immediate meeting with Cerner and a specific plan from Cerner to cure the system's failures.

49.     Masonicare notified Cerner that Cerner had failed to deliver the following integrated functions that were specifically required by the Cerner Contract:

- Seamless data integration between the EHR, point-of-care, interfaced revenue cycle, and MDS. (Schedule 1, Master No. 1474)

- Fully supporting the unique requirements of LTC and CAH billing. (Schedule 1, Master No. 1476)

- Capturing RUGS information from the main LTC system for proper display on 837 bills. (Schedule 1, Master No. 1477)

- Automatically generating all necessary authorizations and paperwork to cover the changes in level of care. (Schedule 1, Master No. 1480)

- Tracking the number of patient benefits days by type (SNF, acute) within the current spell of illness based on prior utilization. (Schedule 1, Master No. 1489)

- Providing the ability to create Medicare Secondary Payer Questionnaire attached to admission date capture screen. (Schedule 1, Master No. 1516)

- Capability to automatically readjust reporting for previous days to reflect the earlier change of status (i.e., a discharge is posted "late" to the system). (Schedule 1, Master No. 1519)

- Correcting days automatically as needed and the adjustment is communicated to all aspects of billing. (Schedule 1, Master No. 1528)

- Capability to natively capture LTC-related data at time of admission and to the extent key data elements are mandated or tracked for compliance, including the following: Qualifying stay information. (Schedule 1, Master No. 1541)

- Capability to natively capture LTC-related data at time of admission and to the extent key data elements are mandated or tracked for compliance, including the following: Medicare days and remaining eligible days – capability of the system to automatically roll the financial class to Medicaid (or other secondary payer) when the Medicare days are exhausted, tracking from the point of admission. (Schedule 1, Master No. 1547)

- Capability to natively capture LTC-related data at time of admission and to the extent key data elements are mandated or tracked for compliance including the following: Medicare 'spend down' dollars. (Schedule 1, Master No. 1548)

- Capability to automatically generate Daily ADT Log (admissions, level-of-care changes, SNF, ICF). (Schedule 1, Master No. 1549)

- Easy to view and report the history of level of care changes by patient and facility. (Schedule 1, Master No. 1559)

50.     Masonicare notified Cerner that Cerner had failed to deliver the following patient-centric functions that were specifically required by the Cerner Contract:

- Interdisciplinary planning and long-term care specific plans of care. (Master No. 1632)

- Standard interdisciplinary plans of care that are localized to meet clinical needs. Clinicians can modify a plan to meet the patient's

needs and there is flexibility to modify plans consistent with care provider workflow. (Master No. 1635)

- Every time a change is documented the solution will automatically date, time, and signature stamp that user's access code. (Master No. 1636)

- The solution supports making changes and updates. (Master No. 1637)

51.     Masonicare notified Cerner that Cerner had failed to deliver documentation, regulatory, and patient care requirements specifically required by the Cerner Contract.  Specifically,

- Master No. 1474 states: Cerner's long-term care EHR solution automates the workflow to support pre-entry of client information during the registration process. Our long-term care solution provides the content that meets the workflows and regulations for LTC/SNF providers. Our simple-to-use, resident centered solution is comprised of four major offerings that support seamless data integration between the EHR, point-of-care, interfaced revenue cycle, and MDS. As a by-product of clinical workflow, documentation flows into the MDS for review/submission. Our long-term care solutions work together securely, and in near real time.

- Master No. 1579 states: the solution captures home medications and supports integration of home medication into medication reconciliation.

But CommunityWorks did not support:

a.     LTC Plan of Care
b.     Treatment Administration documentation
c.     Assessments need for pre- and post-medication administration
d.     Wound Tracking, Power Chart and Care Tracker
e.     Situation, Background, Assessment, Recommendation (SBAR), Care Pathways
f.     Documentation relating to Foley catheter maintenance

52.     Further, CommunityWorks' medication reconciliation process and discharge planning documentation solution did not properly record medications for inpatient stays and transition of care documents, and did not fully support the MDS Licensed Software

Process for reimbursement, including as follows:

> a.   Medicare Number A600B needs manual adjustment by the MDS coordinators for residents that are insured by Managed Care payers.

> b.   CommunityWorks does not properly capture Resident Identifiers, including Social Security numbers, Medicare numbers, Medicaid numbers that are prefilled fields on the MDS.

> c.   CommunityWorks fails to properly capture MDS OMRA assessments including a Start of Therapy (SOT) and End of Therapy (EOT) assessments.

> d.   CommunityWorks misses MDS dates and HIPPS codes, therapy revenue codes, and RUG's, diagnosis codes, and contains incorrect number of payment days on the claim.

53.   CommunityWorks did not deliver seamless Medication Reconciliation and Discharge Documentation, requiring Masonicare to resort to multiple manual paper processes and electronic work-arounds.

54.   CommunityWorks failed to provide functionality that allowed for comprehensive tracking of clinical certifications relating to assisted living. As a result, Masonicare was forced to generate paper Care Plans, and then translate those Plans into Care Tracker for Resident Care Assistant (RCA) tasks. Masonicare also was forced to utilize alternate paper tracking for medication pre-pours, medication deliveries, and medication administration reconciliation.

55.   CommunityWorks' Bar Code Identifier used to identify a drug on the Patient Labels did not match the pre-packaged drug code label. As a result, Masonicare could not automatically match the patient's drug label to the pre-packaged drug label to verify that they are the same medication.

56.   CommunityWorks' Caretracker did not support duplicative medication administration times. The care oversight compiled report, which is needed for RN review and

signature, did not capture care notes, or care delivery times, and did not support division of Resident Care Assistant (RCA) assignments by room/resident.

### E.   CERNER REFUSES TO CURE THE SYSTEM DEFICIENCIES AND INTEGRATION PROBLEMS

57.    In response to Masonicare's November 30, 2018 letter, Cerner promised that it was "reviewing, in detail, the alleged failures set out in the letter" and that "we certainly take the allegations seriously" and that "Our teams will be investigating to determine … what the root cause of the alleged failures may be, and how Cerner is positioned to best respond to the alleged failures."

58.    Despite using the word "alleged," Cerner never disputed the shortcomings and failures set forth in Masonicare's November 30, 2018 letter.

59.    To the contrary, on January 24, 2019, after delaying for two months, Cerner's Mitchell Clark (CommunityWorks President), Randy Eggleston (CommunityWorks Sr. Dir. Client Relationships), Don Lafferty (CommunityWorks Client Results Executive), Steve Herron (Sr. Dir. & Solutions Executive, Post-Acute Care), and Chad Daniels (Operations Manager, LTC Support) met with Masonicare to discuss the deficiencies and integration issues outlined in Masonicare's November 30, 2018 letter.

60.    In that meeting, Masonicare reviewed each of the deficiencies set forth in the November 30, 2018 letter.

61.    The Cerner representatives did not dispute any deficiency identified by Masonicare. To the contrary, as Masonicare reviewed each deficiency, Mitchell Clark asked his long term care team sitting in the room "can we do that?"  For the majority of items, Cerner's long term care team shook their heads "no."  For certain items, the team explained that the deficiencies could not be addressed in the current release of CommunityWorks, and

they were unsure of whether the deficiency would be corrected in future releases.

62.     Then, beginning at the January 24, 2019 meeting, and in telephone conversations thereafter, Cerner for the first time told Masonicare that the deficiencies Masonicare had identified were specific to Masonicare's operations and workflow and that Cerner could not address the deficiencies Masonicare had identified because these changes would impact other customers on the CommunityWorks shared domain.

63.     Cerner told Masonicare that unless and until the other CommunityWorks system users requested the same changes, or were included in one of Cerner's updates of CommunityWorks, Masonicare would have to adapt how it did business and work around the shortcomings of CommunityWorks.

64.     Masonicare asked Cerner to give Masonicare its own domain and make the modifications and fixes required so that the system would operate the way Cerner had represented and promised from the outset

65.     Cerner refused, claiming that such a move would be expensive for Cerner.

66.     From the time of its RFP response until early 2019, Cerner had never explained to Masonicare that because CommunityWorks was on a shared domain, the functionality that Masonicare had specifically requested in its RFP, and that Cerner had promised in Schedule 1, Exhibit B to the Cerner Contract, would not be available to Masonicare.

67.     In fact, the overwhelming majority of the problems Masonicare had identified with the CommunityWorks functionality could be cured by Cerner if Cerner put Masonicare's CommunityWorks system into its own domain and then made the modifications necessary to address Masonicare's operational requirements.

68.     Cerner further told Masonicare that the Cerner system's integration problems were the result of deficiencies in the NTT Data/Cantata system, the system Cerner had advised Masonicare to purchase.

69.     Despite previously identifying NTT Data/Cantata as its preferred partner, recommending this partner to Masonicare, and repeatedly promising and assuring Masonicare that the Cerner system would be fully integrated with the NTT Data/Cantata system, Cerner now told Masonicare that it was not obligated to address the failure of CommunityWorks to integrate with the NTT Data/Cantata system.

70.     Cerner told Masonicare that it was experiencing such pervasive problems integrating with NTT Data/Cantata (both for Masonicare and for other customers) that Cerner was no longer recommending NTT Data/Cantata, and no longer considered NTT Data/Cantata a preferred partner.

71.     Cerner told Masonicare that to obtain the integration with CommunityWorks that Masonicare required, Cerner recommended that Masonicare cancel its contract with NTT Data/Cantata, and install the medical billing system offered by Americare. Cerner explained that it was making this recommendation to all CommunityWorks customers who had NTT Data/Cantata system.

72.     Cerner told Masonicare that, unless and until Masonicare made this switch, Masonicare would have to adapt how it did business and work around Cerner's integration shortcomings.

## F.     MASONICARE IS FORCED TO CONTRACT FOR REPLACEMENT SYSTEMS WHILE CERNER HOLDS HOSTAGE MASONICARE'S DATA

73.     Faced with a system that did not work, with Cerner's refusal to honor its promises, and with Cerner's admission that CommunityWorks did not have the

functionality that it had promised to Masonicare, Masonicare was forced to find new systems to provide what Cerner had promised, but failed to deliver.

74.    On March 9, 2019, Masonicare notified Cerner of its intent to terminate the Cerner Contract due to Cerner's failure to deliver the promised system, and failure to correct the serious deficiencies and failures identified by Masonicare and acknowledged by Cerner.

75.    Due to the failure of the Cerner system, Masonicare was forced to enter into agreements and incur costs for replacement systems including PointClickCare, Meditech, and other third-party vendors' solutions to provide a HealthCare Information System solution.

76.    In addition, because the CommunityWorks systems for Home Health and Hospice was never implemented due to lack of functionality, Masonicare was forced to continue its contract with NetSmart to provide a solution for Home Health and Hospice.

77.    In the notice of termination, Masonicare demanded that Cerner refund the monies paid by Masonicare for the failed Cerner system.

78.    Masonicare also sought assurance that Cerner would fulfill its obligations under section 6.2(C) of the Cerner Contract to provide transition assistance to Masonicare and support continued use of the Cerner system during the transition for up to twenty-four (24) months.

79.    Masonicare also demanded that Cerner provide Masonicare access to Masonicare's data as it transitioned to a new system, and to provide Masonicare data extracts, as Cerner was obligated to do pursuant to section 6.2(D) of the Cerner Contract.

80.    Cerner wrongfully refused to return Masonicare's data, and attempted to leverage its wrongful retention of Masonicare's data to demand payment that Cerner was not entitled to receive.

81.     Masonicare advised Cerner that it needed the data, which contained historical patient information, in order to provide skilled nursing, acute care, and residential living services to patients and to comply with regulatory obligations.

82.     On July 19, 2019, Cerner sent Masonicare a letter ignoring Masonicare's notice of termination and stating that Cerner was terminating the Cerner Contract for alleged lack of payment, and that it would not return Masonicare's data unless Masonicare signed a so-called "Transition Agreement" that Cerner attached to the letter.

83.     In this "Transition Agreement," Cerner demanded that Masonicare pay over $9 million for services that Cerner never provided, plus transition service fees of $3,900 per month, and release Cerner from all liability.

84.     As of the filing of this Complaint, Cerner has refused to comply with its duty to transfer Masonicare's data.  Rather, if Masonicare needs to access its own historical data, it is forced to log on to the Cerner system.

85.     Cerner is demanding fees of $122,252 per month from Masonicare for access to the data that Cerner is wrongfully withholding.

86.     The burden and losses suffered by Masonicare due to Cerner's wrongful withholding of data are compounded by the fact that Masonicare cannot fully trust the data and reports generated from the Cerner system.

87.     Because Cerner will not transfer the data back to Masonicare, every time Masonicare needs to access historical data, it is forced to work around the voluminous problems with the CommunityWorks system and independently verify the accuracy of the data.

88.     In addition, because of the Cerner system's shortcomings and flaws which Cerner refused to cure, Masonicare cannot run reports and provide records in the proper

form requested by the Connecticut DPH, which has caused the DPH to issue warnings to Masonicare, which if not addressed could cause the DPH to issue deficiencies, penalties, and/or fines against Masonicare.

89.     The CommunityWorks system never operated with the functionality that was represented in the Cerner RFP Response, promised in the Cerner Contract, and repeatedly promised by Cerner when Masonicare set forth the detailed list of system failures experienced after the system went live.

90.     Cerner's ongoing breaches and unfair and deceptive acts or practices occurred, and continue to occur, in a continuing course of conduct from the inception of the relationship through the filing of this Complaint.

## COUNT ONE
### (Violation of CUTPA)

91.     Masonicare incorporates by reference paragraphs 1 through 90 as if set forth fully herein.

92.     At all times relevant hereto, Cerner's conduct was taken in the course of its primary trade or business within the meaning of Conn. Gen. Stat. §§ 42-110b *et. seq.*, the Connecticut Unfair Trade Practices Act ("CUTPA").

93.     Masonicare was a consumer of Cerner's products and services.

94.     Cerner is a Fortune 500 company.  Masonicare is a local not-for-profit.

95.     Cerner engaged in unfair and deceptive conduct at every step of its relationship with Masonicare.

96.     To induce Masonicare to select Cerner's product and services, Cerner made false statements of fact, and made knowing or reckless misrepresentations or omissions concerning the functionality and capabilities of the CommunityWorks, the results that

Masonicare could expect, and Cerner's commitment to "achieve [Masonicare's] vision."

97.     Upon implementation, when Masonicare expressed concerns about the system's functionality and integration, Cerner continued to make false statements of fact, and knowing or reckless misrepresentations or omissions concerning the functionality and capabilities of CommunityWorks, and the availability of corrective measures to address Masonicare's concerns.

98.     Cerner did not work in good faith to address Masonicare's concerns but fed Masonicare false hopes and strung Masonicare along in order to delay or deter Masonicare from enforcing its rights and obtaining a remedy, or in the hope that Masonicare would simply give up and make do with the defective product.

99.     Cerner's response to the RFP, and representations in the Cerner Contract – which included 40 pages of detailed answers to Masonicare's questions in the RFP, answers that repeated hundreds of times that CommunityWorks would provide the functionality that Masonicare wanted and needed – baited Masonicare into entering a business relationship with Cerner.

100.    Once Masonicare took this bait and was contractually committed to working with Cerner, Cerner made the switch and delivered a different product – and a different business relationship – than it had promised Masonicare.

101.    When Masonicare cried foul on Cerner's bait and switch tactics, and ultimately terminated the Cerner Contract, Cerner refused to acknowledge the termination and has since held hostage Masonicare's data.  This data is material to patient care and regulatory compliance.  Cerner's purpose in holding the data hostage is to place Masonicare under duress in an effort to extract millions of dollars from Masonicare and compel Masonicare to surrender its legal remedies.

102.    Cerner continues to assert false billings in an attempt to intimidate Masonicare and deter it from exercising its legal rights, including continuing to invoice Masonicare for the defective CommunityWorks system, a system Masonicare only accesses to review historical data because Cerner has wrongfully refused to transfer Masonicare's data to Masonicare.

103.    Cerner's conduct constitutes unfair acts or practices prohibited by CUTPA in that:

> a.    It offends the public policy of the State of Connecticut and the United States insofar as Cerner has impeded and interfered with Masonicare's efforts to comply with healthcare recordkeeping and reporting laws and regulations, including as pronounced in The Public Health Code of the State of Connecticut, Chapter IV, § 19-13-D 8t-v, 13-D 9, and 13-D 12; in The Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996); the statutes and regulations relating to Medicare, 42 U.S.C 1395 *et seq.* and 42 C.F.R. § 400 *et seq.*; and the statutes and regulations relating to Medicaid, 42 U.S.C. 1396 *et seq.* and 42 C.F.R 430 *et seq.*;

> b.    It is immoral, unfair, unscrupulous, oppressive and unethical; and/or

> c.    It has caused substantial injury, which Masonicare could not reasonably have avoided, and which is not outweighed by any countervailing benefits to competition or consumers.

104.    Cerner's conduct constitutes deceptive acts or practices prohibited by CUTPA in that Cerner:

> a.    Made false statements and misleading representations or omissions to induce Masonicare to select Cerner's product and services, to extract money from Masonicare, and to intimidate and deter Masonicare from exercising its legal rights;

> b.    Masonicare reasonably interpreted Cerner's statements; and

> c.    The false statements and misleading representations or omissions were material in that they were likely to affect Masonicare's consumer decisions or conduct, including Masonicare's decisions

to contract with Cerner.

105.   As a proximate result of Cerner's unfair and/or deceptive acts or practices, Masonicare has suffered, and will continue to suffer, ascertainable loss, including economic damages and the loss of substantial time and labor invested trying to work around, and then replace, a defective system.

106.   Cerner's conduct constitutes intentional and wanton violations of Masonicare's rights, or was done with a reckless indifference to those rights.

107.   As a result of Cerner's unfair and/or deceptive acts or practices, Masonicare is entitled to compensatory damages, punitive damages and statutory attorney's fees pursuant to Conn. Gen. Stat. § 42a-110g(d).

108.   Pursuant to Conn. Gen. Stat. § 42-110g(c), a copy of the complaint has been provided to the Attorney General and the Commissioner of Consumer Protection.

**COUNT TWO**
**(Breach of Contract)**

109.   Masonicare incorporates by reference paragraphs 1 through 90 as if set forth fully herein.

110.   The Cerner Contract constitutes a valid and enforceable agreement.

111.   At all relevant times, Masonicare fulfilled its obligations under the Cerner Contract.

112.   Cerner materially breached the Cerner Contract by failing to deliver the functionality promised in the Cerner Contract, failing to cure the breaches Masonicare identified in writing, failing to refund Masonicare the monies paid to Cerner, and failing to return Masonicare's data.

113.   Masonicare notified Cerner of its breaches but Cerner failed and

22

refused to cure these breaches.

114.    As a direct and proximate result of Cerner's breaches, Masonicare paid Cerner in excess of $3.55 million for the Cerner system and support that never functioned as promised in the Cerner Contract.

115.    As a direct and proximate result of Cerner's breach, Masonicare has suffered damages, including expenses for remedial measures, including additional third-party consulting to deal with the non-functional Cerner system, and additional sums to manually operate the functions that Cerner promised would be automated. Masonicare also suffered losses resulting from the lack of promised functionality in its billing systems.

**COUNT THREE**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

116.    Masonicare incorporates by reference paragraphs 1 through 90 as if set forth fully herein.

117.    Every contract contains an implied covenant of good faith and fair dealing that requires all parties to a contract to refrain from engaging in conduct that would either impair the value of the contract, or interfere with a party's ability to reap the economic benefits of the contract.

118.    Cerner breached the implied covenant of good faith and fair dealing in the Cerner Contract by failing and refusing to take responsibility for a Cerner system that was not functional, and failing and refusing to devote the resources required to make the Cerner system function as promised.

119.    Cerner also breached the implied covenant of good faith and fair dealing by demanding Masonicare pay over $9 million and release all claims against Cerner before Cerner would agree to perform its contractual obligation to transfer Masonicare's data,

23

and thereafter sent Masonicare invoices for purported monthly support fees of $122,252 after the Cerner Contract was terminated so that Masonicare could access its data using the Cerner system. In other words, Cerner sought to impose new conditions on old obligations, and to hold vital data hostage in an attempt to leverage money from Masonicare and deprive Masonicare of a remedy.

120.    Cerner's actions have frustrated the purpose of the Cerner Contract and have caused damages to Masonicare.

**COUNT FOUR**
**(Breach of Contract / Specific Performance)**

121.    Masonicare incorporates by reference paragraphs 1 through 90 as if set forth fully herein.

122.    Masonicare demanded that Cerner return its data to it in accordance with Section 6.2(D) of the Cerner Contract.

123.    Masonicare has tendered to Cerner its then-standard fees associated with returning the data to it in accordance with Section 6.2(D) of the Cerner Contract, but Cerner refuses to do so.

124.    Masonicare's data contains historical patient information that is essential for Masonicare to comply with regulatory requirements and to provide health care services.

125.    Masonicare does not have an adequate remedy at law and justice requires specific performance of Cerner's obligations under Section 6.2(D).

126.    No hardship or injustice will result to Cerner related to the enforcement of its obligations to return the data pursuant to Section 6.2(D).

127.     Masonicare is entitled to a judgment of specific performance against

24

Cerner requiring (a) Cerner to comply with its obligations under Section 6.2(D) of the Cerner Contract and return Masonicare's data in a format that is usable by Masonicare, and (b) such further relief that the Court deems equitable and appropriate.

## COUNT FIVE
### (Declaratory Judgment)

128.    Masonicare incorporates by reference paragraphs 1 through 90 as if set forth fully herein.

129.    Under the express terms of the Cerner Contract, Masonicare had the right to receive a Cerner system with the functionality stated in the Cerner Contract.

130.    Cerner materially breached the Cerner Contract.

131.    Masonicare properly terminated the Cerner Contract as a result of Cerner's material breach.

132.    As a result of Cerner's material breach, Masonicare owed no further obligations to Cerner, and was entitled to return of all monies paid by Masonicare.

133.    Cerner asserts that it did not breach the Cerner Contract, that Masonicare is in breach of that agreement for failure to pay invoices Cerner asserts are due under the agreement.

134.    Cerner asserts that it terminated the Cerner Contract effective December 31, 2019 and that Masonicare owes damages to Cerner.

135.    An actual case and controversy exists between Masonicare and Cerner concerning their respective rights under the Cerner Contract.

136.    A declaratory judgment is both necessary and essential to clarifying and settling the parties' legal rights and obligations under the Cerner Contract.  Masonicare is entitled to a declaratory judgment stating that:

a.    Cerner materially breached the Cerner Contract;

b.    As a result of Cerner's material breach, Masonicare owed no further obligations to Cerner, and was entitled to return of all monies paid by Masonicare.

c.    Masonicare has not breached the Cerner Contract.

d.    Masonicare is entitled to immediate return of all of its data, subject only to paying the costs associated with data transfer.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff Masonicare requests that this Court enter a judgment against

Defendant Cerner awarding:

a.    Compensatory damages (Counts One through Four);

b.    Attorney's fees, expert's fees, costs and expenses pursuant to Conn. Gen. Stat. § 42-110g(d) (Count One);

c.    Punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a) (Count One);

d.    Return of Masonicare's data (Counts One, Four, and Five);

e.    A declaration stating that

i.    Cerner materially breached the Cerner Contract;

ii.   As a result of Cerner's material breach, Masonicare owed no further obligations to Cerner, and was entitled to return of all monies paid by Masonicare;

iii.  Masonicare has not breached the Cerner Contract;

iv.   Masonicare is entitled to immediate return of all of its data, subject only to paying the costs associated with data transfer; and

f.    Such other and further relief as the Court deems just and proper.

MASONICARE CORPORATION

By: */s/ David A. Slossberg*
David A. Slossberg (ct13116)
Jeffrey P. Nichols (ct29547)
Hurwitz, Sagarin, Slossberg
& Knuff, LLC
147 North Broad Street
Milford, CT  06460
Telephone: (203) 877-8000
Fax: (203) 878-9800
DSlossberg@hssklaw.com
JNichols@hssklaw.com

Andrew K. Fletcher
Richard M. Weibley
Blank Rome LLP
501 Grant Street, Suite 850
Pittsburgh, PA 15219
Telephone: (412) 932-2736
afletcher@blankrome.com
rweibley@blankrome.com

*Counsel for Plaintiff Masonicare Corporation*

27